Eastern District of Kentucky
F I L E D

JUL 1 4 2020

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## AT LEXINGTON

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| EX REL. CAITLIN SECAMIGLIO | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  5:20-CV-305-DCR |
| | ) | |
| LABTOX, LLC, RON COBURN, | ) | **Filed under Seal Under False** |
| NORMA HOPE BAKER, and | ) | **Claims Act** |
| ERICA BAKER, | ) | |
| | ) | **Jury Demanded** |
| Defendants. | ) | |
| | ) | |

### COMPLAINT
### FILED UNDER SEAL PURSUANT TO FALSE CLAIMS ACT,
### 31 U.S.C. §§ 3729-3733

Comes Plaintiff United States of America, ex. rel. Caitlin Secamiglio, by and through

counsel and, for its Complaint against Defendants Labtox, LLC, Rob Coburn, Norma Hope Baker

and Erica Baker under the False Claims Act ("FCA"), filed under seal pursuant to 31 U.S.C. §

3730(b)(2), states as follows:

### I.    JURISDICTION, VENUE, PARTIES

1.      This action arises under, amongst other federal statutes described further below, the

FCA, as amended, 31 U.S.C. §§ 3729-33.  Accordingly, this Court has jurisdiction over this action

under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

2.      Venue is proper in the Eastern District of Kentucky pursuant to 28 U.S.C. § 1391(b)

and 31 U.S.C. § 3732(a).

3.      This Court may exercise personal jurisdiction over Defendant pursuant to 31 U.S.C.

§ 3732(a) and because Defendant resides and transacts business in this District.

1

4.     Plaintiff, the United States of America, ex rel. Caitlin Secamiglio brings this action on behalf of the Department of Health and Human Services ("HHS"), and, specifically, its operating division, the Centers for Medicare & Medicaid Services ("CMS").

5.     Relator Caitlin Secamiglio is an individual who resides in Lexington, Kentucky. Ms. Secamiglio is a former employee of Defendant Labtox, LLC. Relator has voluntarily disclosed to the Government substantially all information known to her relating to the allegations and transactions upon which the claims herein are based from her own knowledge that is independent of other sources, it having been obtained by Relator during her employment at Defendant Labtox, LLC. Stated another way, Relator has direct and independent knowledge of the facts underlying this complaint, and the facts and allegations underlying this complaint have not been publicly disclosed as defined under the False Claims Act, including 31 U.S.C. § 3730(e).

6.     Labtox, LLC ("Labtox") is a Kentucky for-profit limited liability company with its p 2716 Old Rosebud Rd., Ste. 280, Lexington, KY 40509, which may be served by service of process on its registered agent, Erica Baker, at the same address.

7.     Ron Coburn is an individual resident of the Commonwealth of Kentucky. Mr. Coburn serves as the Chief Executive Officer of Defendant Labtox, LLC and, upon information and belief, is the beneficial owner of Labtox, LLC, despite holding out to the public that Labtox, LLC is owned by Norma Hope Baker. Upon information and belief, Ms. Norma Hope Baker is Mr. Coburn's wife (Mr. Coburn holds out to the public that Ms. Norma Hope Baker is his wife).

8.     Norma Hope Baker is an individual resident of the Commonwealth of Kentucky. Upon information and belief, Ms. Baker is listed as the owner of Defendant Labtox, LLC and is the wife of Defendant Coburn.

9.      Erica Baker is an individual resident of the Commonwealth of Kentucky.  Ms. Erica Baker is the Director of Operations and Compliance of Defendant Labtox, LLC, and described in part her work for Labtox, LLC in a video available online at https://vimeo.com/391005482.

## II.      OVERVIEW OF DEFENDANTS' ILLEGAL SCHEME

10.      Labtox performs urine drug testing ("UDT"), which, used appropriately, informs physicians of the amount of a particular substance (be it a prescription drug such as oxycodone or an illicit substance such as heroin) in a patient's system.

11.      Labtox developed a scheme of billing the United States Government massive amounts of money by performing complex and voluminous UDT on the urine of residents of inpatient drug rehabilitation facilities (hereafter, the "Facilities") and on the urine of persons ordered to participate in drug testing as part of court proceedings.

12.      Through its practices, described in more detail below, Labtox knowingly submitted many thousands of false and fraudulent claims to Medicare and Kentucky Medicaid for excessive and unnecessary UDT and for UDT referred in violation of the Anti-Kickback Statute and the Civil Monetary Penalties Law; as a result of these false claims Labtox was improperly paid many millions of dollars in reimbursement.

13.      In short, the claims were false for one or more (in some cases all) of the following reasons:

14.      The UDT was not medically necessary because it was not ordered by a physician as part of an individualized course of treatment of the individual whose urine was being tested, but was instead ordered pursuant to a sham "standing order" applicable to an entire facility, when the physician had no contact or relationship with the residents in that facility, let alone individually

tailoring UDT testing regimes for each patient following review of the patient's own circumstances (including review of previous UDT test results).

15.    Labtox represented it was not violating the Anti-Kickback statute; however, Labtox was providing kickbacks to the facilities generating the testing referrals by, *inter alia*, paying "collector" compensation to persons selected by the facility, including excessive compensation and including payments to (A) facility employees, displacing the facility's obligation to pay the employees from facility funds and (B) facility management and persons related to facility management.

16.    Labtox represented in presenting the claim to the Government that it was following the copay requirements of Medicare and Medicaid, but, to generate excessive test requests, Labtox regularly advertised that it would not, and regularly did not, collect a copay from the person being tested, although collecting such copays was required by law.

17.    The UDT was not medically necessary but was instead performed because testing was ordered by a Court in connection with Court proceedings;

### III.    LAW

#### A.    The Federal False Claims Act

18.    The FCA provides, at U.S.C. § 3729(a)(1), in pertinent part, that a person who:

knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains . . . .

19.    For purposes of the FCA, pursuant to 31 U.S.C. § 3729(b)(1), the terms "knowing" and "knowingly"— mean that a person, with respect to information – has actual knowledge of the

4

information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information; and require no proof of specific intent to defraud[.]

### B.      The Medicare and Medicaid Programs

#### 1.      The Medicare Program

20.      In 1965, Congress enacted Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare program.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426-1. CMS administers the Medicare program. At all times relevant to this complaint, CMS contracted with private contractors, referred to as "fiscal intermediaries," "carriers," and Medicare Administrative Contractors ("MACs"), to act as agents in reviewing and paying claims submitted by health care providers. 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.   The Medicare program consists of four parts: A, B, C, and D.  Labtox billed Medicare under Part B, which covers certain medical services, such as clinical laboratory test services, furnished by physicians and other providers and suppliers. 42 U.S.C. § 1395k(a)(2)(B).

21.      The FCA was amended pursuant to Public Law 111-21, the Fraud Enforcement and Recovery Act of 2009 ("FERA"), enacted May 20, 2009. Sections 3729(a)(1) of the prior statute applies to conduct that occurred before FERA was enacted, and Section 3729(a)(1)(A) of the revised statute applies to conduct after FERA was enacted. Section 3729(a)(1)(B) is applicable to all claims in this case by virtue of Section 4(f) of FERA.

22.      To participate in the Medicare program as a new enrollee, clinical laboratories, such as Labtox, must submit a Medicare Enrollment Application, CMS Form-855B. Laboratories also

complete Form CMS-855B to change information or to reactivate, revalidate and/or terminate Medicare enrollment.

23.     Medicare regulations require providers and suppliers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

24.     An authorized official must sign the "Certification Section" in Section 15 of Form CMS-855B, which "legally and financially binds [the] supplier to all of the laws, regulations, and program instructions of the Medicare program."

25.     Authorized officials for Labtox signed the certification statement in Section 15 of Form CMS-855B, indicating that they understood that the laboratory was required to comply with Medicare laws, regulations, and program instructions, which include, but are not limited to, the Anti-Kickback Statute ("AKS") and Civil Monetary Penalties Law ("CMPL").

26.     The National Provider Identifier ("NPI") is a standard and unique health identifier for health care providers. All providers and practitioners must have an assigned NPI number prior to enrolling in Medicare.

27.     To obtain Medicare and Medicaid reimbursement for certain outpatient items or services, providers and suppliers submit a claim form known as the CMS 1500 form ("CMS 1500") or its electronic equivalent known as the 837P form. Among the information the provider or supplier includes on a CMS 1500 or 837P form are certain five-digit codes, including Current Procedural Terminology Codes ("CPT codes") and Healthcare Common Procedure Coding System ("HCPCS") Level II codes, that identify the services rendered and for which reimbursement is sought, and the unique billing identification number of the "rendering provider" and the "referring provider or other source."

6

28.     The Medicare statute requires that each request for payment or bill submitted for an item or service payable under Medicare Part B include the name and unique physician identification number for the referring physician. 42 U.S.C. § 1395l(q)(1).

### 2.     The Kentucky Medicaid Program

29.     The Kentucky Medicaid Program is authorized by Title XIX of the Social Security Act. 42 U.S.C. §§ 1396 *et seq.* Medicaid is a joint federal-state program that provides health care benefits, including laboratory services coverage, for certain groups including the poor and disabled. The Kentucky Medicaid program is required to implement a "State Plan" containing certain specified minimum criteria for coverage and payment of claims in order to qualify for federal funds for Medicaid expenditures. 42 U.S.C. § 1396a.

30.     The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d (b). The Cabinet for Health and Family Services ("CHFS"), Department for Medicaid Services has responsibility to administer the Medicaid Program in accordance with Title XIX of the Social Security Act. KRS 205.520(3) authorizes the Cabinet, by administrative regulation, to comply with any requirement that may be imposed or opportunity presented by federal law for the provision of medical assistance to Kentucky's indigent citizenry. Kentucky Administrative Regulations ("KAR") Chapter 907 contains implementing regulations, as authorized by KRS 205.520(3), to govern Kentucky's Medicaid services.

31.     Physicians and laboratories certify in their state Medicaid provider enrollment forms that they will comply with all federal and state laws applicable to Medicaid. Kentucky's Medicaid Provider Enrollment Application "MAP-811 Provider Application," which is mandated pursuant to 907 KAR 1:672, § 2 1(c)(1), must be completed by any person or entity desiring to

receive payment for services provided to Medicaid recipients. Under the "Medicaid Rules, Regulations, Policy, and 42USC 1320a-7b" Section of the Application, in order to be eligible to receive direct or indirect payments for services rendered to Kentucky Medicaid Program recipients, a provider must certify that the provider represents, understands and agrees:

> under penalty of law, that the information given in this form is correct and complete to the best of my knowledge. I am aware that, should investigation at any time show any falsification, I will be considered for suspension from the Program and/or for prosecution for Medicaid fraud. I certify that I have read and understand the "Medicaid Rules, Regulation, Policy", 42 USC 1320A-7B" (pp. 8-11), 907 KAR 1:671, and 907 KAR 1:672 to the best of my ability. I agree to abide by the Medicaid Program terms and conditions listed in this document and aforementioned regulations, and I hold a license/certification to provide services corresponding to the information above and for which this agreement applies. I hereby authorize the Cabinet for Health and Family Services, the Department for Medicaid Services to make all necessary verification concerning me and/or my medical practice/facility, and further authorize each educational institute, medical/license board or organization to provide all information that may be needed in connection with my application for participation in the Kentucky Medicaid Program. I further certify that if I keep medical records in an electronic database, those records are confidential and patient privacy is protected (KRS 205.510) MAP-811 Provider Application, Provider Signature Page, at page 12.

32.    Accordingly, every time they submit an electronic claim to the Kentucky Medicaid program, physicians and laboratories certify that they are complying with state and federal laws applicable to the Medicaid program.

### C.    Regulations Regarding Coverage for Laboratory Tests

33.    Medicare and Kentucky Medicaid regulations both make clear that (A) laboratory tests must be ordered by a physician or other authorized prescribing professional treating the patient for the treatment of a specific illness or injury, (B) that laboratory test orders that are not individualized to patient need (or for which the need is not documented in the patient chart) are not covered services, and (C) that claims for such services must be denied.

8

1.    **Medicare Coverage for Laboratory Tests**

34.    Laboratory services must meet all applicable requirements of the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), as set forth at 42 C.F.R. Part 493.

35.    Medicare Part B pays for covered diagnostic laboratory tests that are furnished by a laboratory. 42 C.F.R. § 410.32(d)(v). "Clinical laboratory services involve the . . . examination of materials derived from the human body for the diagnosis, prevention, or treatment of a disease or assessment of a medical condition." Medicare Benefit Policy Manual ("MBPM"), (Pub. 100-02), Ch. 15, § 80.1, available at http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c15.pdf.

36.    Medicare Part B only covers services, including diagnostic laboratory services, that are reasonable and necessary for the diagnosis or treatment of an illness. See 42 U.S.C. § 1395y(a)(1)(A) ("[N]o payment may be made under [Medicare] part A or part B . . . for any expenses incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member[.]")

37.    Pursuant to 42 C.F.R. § 410.32(a), all diagnostic tests "must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." The MPBM's "Requirements for Ordering and Following Orders for Diagnostic Tests" define an "order" as "a communication from the treating physician/practitioner requesting that a diagnostic test be performed for a beneficiary.... [T]he

physician must clearly document, in the medical record his or her intent that the test be performed."

MPBM, Ch. 15, Section 80.6.1.

38.     Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary. 42 C.F.R. § 410.32(a). Clinical laboratory services must be ordered and used promptly by the physician who is treating the beneficiary as described in 42 C.F.R. § 410.32(a). MPBM, Ch. 15, § 80.1.

39.     In order to assess whether those services are reasonable and necessary and whether reimbursement is appropriate, Medicare requires proper and complete documentation of the services rendered to beneficiaries. In particular, the Medicare statute provides that:

> No payment shall be made to any provider of services or other person under this part unless there has been furnished such information as may be necessary in order to determine the amounts due such provider or other person under this part for the period with respect to which the amounts are being paid or for any prior period.

42 U.S.C. § 1395l(e); *see also* 42 U.S.C. § 1395u(c)(2)(B)(i) ("The term 'clean claim' means a claim that has no defect or impropriety (including any lack of any required substantiating documentation)....").

40.     Medicare regulations expressly state that a laboratory's claim for a service will be denied if there is not sufficient documentation in the patient's medical record to establish that the service was reasonable and necessary. 42 C.F.R. § 410.32(d)(3).CMS regulations further empower laboratories to request documentation from physicians regarding medical necessity:

> ***Medical necessity.*** The entity submitting the claim may request additional diagnostic and other medical information from the ordering physician or nonphysician practitioner to document that the services it bills are reasonable and necessary.

42 C.F.R. § 410.32(d)(3).

43      The Department of Health and Human Services, Office of Inspector General

("HHS-OIG") has published Compliance Program Guidance for Clinical Laboratories in the

Federal      Register.      63      Fed      Reg.      45076      (Aug.      24,      1998),      available      at

https://oig.hhs.gov/authorities/docs/cpglab.pdf.   Among other things, the HHS-OIG guidance

clarifies that laboratory order forms should emphasize the need for a justification and assessment

of each test ordered and that Medicare does not pay for tests for screening purposes:

> Medicare may deny payment for a test that the physician believes is appropriate,
> but which does not meet the Medicare coverage criteria (e.g., done for screening
> purposes) or where documentation in the entire patient record, including that
> maintained in the physician's records, does not support that the tests were
> reasonable and necessary for a given patient....

> Requisition design: While HCFA [(CMS)] does not design or approve requisition
> forms, laboratories should construct the requisition form to capture the correct
> program information as required by Federal or private health care programs and to
> promote the conscious ordering of tests by physicians or other authorized
> individuals. The laboratory should construct the requisition form to ensure that the
> physician or other authorized individual has made an independent medical
> necessity decision with regard to each test the laboratory will bill. . . . **The form
> should contain a statement indicating that Medicare generally does not cover
> routine screening tests.**. . .

> Reliance on Standing Orders
> Although standing orders are not prohibited in connection with an extended course
> of treatment, too often they have led to abusive practices. Standing orders in and of
> themselves are not usually acceptable documentation that tests are reasonable and
> necessary. . . . Medicare contractors can and may require additional documentation
> to support the medical necessity of the test. **As a result of the potential problems
> standing orders may cause, the use of standing orders is discouraged.**

*Id.* at 45079, 45081 (emphasis added).

### 2.      Kentucky Medicaid Coverage for Laboratory Tests.

44      Kentucky Medicaid also requires that testing be individualized to the medical needs

of patients. 907 KAR 3:130 provides that:

Section 2.        Medical Necessity Determination.

(1)     The determination of whether a covered benefit or service is medically necessary shall:

    (a)     Be based on an individualized assessment of the recipient's medical needs; and

    (b)     Comply with the requirements established in this paragraph.  To be medically necessary or a medical necessity, a covered benefit shall be:

        1.      Reasonable and required to identify, diagnose, treat, correct, cure, palliate, or prevent a disease, illness, injury, disability, or other medical condition, including pregnancy;

        2.      Appropriate in terms of the service, amount, scope, and duration based on generally-accepted standards of good medical practice;

        3.      Provided for medical reasons rather than primarily for the convenience of the individual, the individual's caregiver, or the health care provider, or for cosmetic reasons;

        4.      Provided in the most appropriate location, with regard to generally-accepted standards of good medical practice, where the service may, for practical purposes, be safely and effectively provided;

        5.      Needed, if used in reference to an emergency medical service, to exist using the prudent layperson standard;

        6.      Provided in accordance with early and periodic screening, diagnosis, and treatment (EPSDT) requirements established in 42 U.S.C. 1396d(r) and 42 C.F.R. Part 441 Subpart B for individuals under twenty-one (21) years of age; and

        7.      Provided in accordance with 42 C.F.R. 440.230.

**D.     Self-Referral and Anti-Kickback Prohibitions.**

**1.     The Anti-Kickback Statute.**

45      The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, of poor quality, or potentially harmful to

12

patients. To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. The statute was first enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medieare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

46      The Anti-Kickback Statute prohibits any person or entity from making or accepting payment, in cash or in kind, to induce or reward any person for referring, recommending or arranging for federally-funded medical services, including services provided under the Medicare and Medicaid programs. In pertinent part, the statute provides:

(b)      Illegal remunerations...

(2)      whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person--

(A)      to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)      to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).

47     Compliance with the Anti-Kickback Statute is a condition of payment by the Medicare program. 42 U.S.C. § 1320a-7(b)(7).

### 2.     The Civil Monetary Penalties Law

48     The Civil Monetary Penalties Law prohibits offering or transferring remuneration to federal program beneficiaries if the provider knows of should know that the remuneration is likely to influence the beneficiary to order or receive items or services payable by federal or state healthcare programs, such as Medicare or Kentucky Medicaid, from a particular provider.  42 U.S.C. § 1320a-7a(a)(5).

49     "Remuneration" is specifically defined under the Civil Monetary Penalties Law to include waivers of copays and deductibles.  42 U.S.C. § 1320a-7a(i).

## IV.     BACKGROUND: TYPES OF UDT, GUIDELINES, AND REIMBURSEMENTS

### A.     Types of Urine Drug Tests

50     Drug testing is used to determine the presence or absence of drugs or metabolites, also known as "analytes," in a patient's system. Drug testing can be "qualitative" (to determine the presence or absence of an analyte) or "quantitative" (to provide a numerical concentration of an analyte). Different testing methodologies have different capabilities and limitations.

51     Drug testing is performed in a number of contexts. Some workplaces have mandatory drug testing requirements, in some instances required by federal regulations. In the clinical health care context, drug testing can be used to monitor whether patients are taking prescribed drugs or taking or abusing drugs not prescribed.

52     Urine is the most common medium used for drug testing, and is the predominant medium for testing used by Labtox.

53      There are different types of drug testing, generally based on the location of the test (in-office or at a laboratory), which have different associated costs.

54      "Point of care" or "POC" testing—at a physician's office or clinic—is generally performed by "immunoassay" methodologies, which generally provide a qualitative result indicating the presence or absence of a drug or drug class above pre-set "cut-off" or concentration levels. In-office testing is often performed with POC drug test cups that have a number of built-in drug test strips, each of which tests for a specific drug or drug class. In-office testing can also be performed on immunoassay analyzer machines, known as "desktop" or "benchtop" analyzers, which are more sophisticated and generally reimbursed at higher levels than POC test cups.

55      Under CLIA, CMS oversees all laboratory testing services. UDT performed using POC drug test strips and test cups is generally "CLIA-waived." CLIA-waived tests are categorized as simple laboratory examinations and procedures that have an insignificant risk of an erroneous result or pose no risk of harm to the patient if the test is performed incorrectly. 43 C.F.R. § 493.15(b). To perform CLIA-waived tests, physicians need to enroll in CLIA and obtain a waiver. 42 C.F.R. § 493.35. To operate a benchtop or desktop analyzer, physician practices are generally required to obtain CLIA certification to perform moderate- or high complexity laboratory tests.

56      As discussed in the next section, since April 2010, Medicare generally only reimburses one unit of POC testing per patient encounter, based on the methodology used (analyzer versus POC test cup with embedded test strips). As of January 1, 2011, the Medicare reimbursement for POC tests is determined by the complexity of the test under CLIA (HCPCS billing code "G0434" for CLIA-waived tests and "G0431" for high-complexity analyzer tests).

57      POC drug testing, including use of POC test cups, is the standard of practice for drug testing in pain management and drug rehabilitation programs. Most patients need only

limited, if any, laboratory testing, based on their POC test results, drug abuse history, and clinical presentation.

58     Testing at laboratories is generally performed by more precise methodologies, such as column chromatography in combination with mass spectrometry. Such methods include gas chromatography with mass spectrometry ("GCMS") and liquid chromatography with mass spectrometry ("LCMS"). These testing methodologies can provide quantitative results, identifying the *concentration* of a drug or metabolite in a sample. Quantitative tests are often billed for each drug or drug class tested, using CPT codes assigned for quantitative tests of each drug or class and, in some cases, multiple units of those CPT codes. Quantitative tests can be used to "confirm" POC test results, as they use a second, more accurate methodology.

59     Labtox performed UDT by liquid chromatography with tandem mass spectrometry ("LC-MS/MS").

60     Labtox's LC-MS/MS technology enabled it to test urine specimens for numerous drugs and metabolites during a single run of an aliquot of a urine sample through the LC-MS/MS machine

**B.     Expected Versus Unexpected POC Test Results**

61     The clinical value of Labtox's "confirmatory" or "quantitative" laboratory testing depends on a patient's medical condition. The clinical utility of a "confirmation" or "quantitation" of POC test results depends in part on whether the POC test result is expected or unexpected, and the patient's drug abuse history and clinical presentation.

62     For example, if a patient is prescribed a certain drug, such as Xanax, a positive POC test result for benzodiazepines (of which Xanax is one) would be expected. If the test result is negative for benzodiazepines, however, and the patient insists that she is taking her Xanax as

prescribed, a quantitative laboratory test to "confirm" whether this unexpected negative result is correct may be reasonable and necessary.

63      Similarly, if a patient's POC test yielded a positive result for a non-prescribed or illicit drug, but the patient denies having used the drug,[1] then a quantitative laboratory test to evaluate (i.e., "confirm") this unexpected positive result may be reasonable and necessary.

64      In some instances, laboratory testing of an expected POC test result or for a substance not available on a POC test may also be warranted.  For example, aberrant patient behavior, unexpected clinical presentation, or a history of drug abuse may justify specific laboratory tests.

65      The clinical value of such tests, however, depends on the presentation and physician assessment of each individual patient and that patient's need for each such test.

66      If a POC test is negative for an illicit drug or drug not prescribed, and there is nothing in the patient's presentation or drug abuse history to indicate abuse of that drug, then a quantitative laboratory test for that drug is  generally not reasonable and necessary for the treatment and diagnosis of that patient, and therefore not covered by Medicare.

**C.      Guidelines on Urine Drug Testing**

67      Several organizations have published guidelines regarding UDT in the clinical setting, including UDT for chronic pain patients prescribed opioids. According to the Substance Abuse and Mental Health Services Administration ("SAMSHA"), the development of UDT guidelines in the clinical setting draws on the experience of workplace drug testing, including the

---

[1]      If the patient acknowledges in response to a POC test result having used a drug (as patients sometimes do), this is often the only clinically-valuable information needed by the physician, and quantitative testing to determine the levels of the drug does not in that circumstance provide further clinically-valuable information.

21 Federal Drug-Free Workplace Program and its guidelines ("Federal Workplace Guidelines").

73 Fed. Reg. 71858 (Nov. 25, 2008).

68      Under the Federal Workplace Guidelines, a "Negative Result" includes results reported by certified laboratories when a valid specimen "contains no drug or the concentration of the drug is less than the cutoff concentration for that drug or drug class." *Id.* at 71878 (Sec. 1.5). Laboratories may report a valid specimen as "negative" when "each initial drug test is negative[.]" *Id.* at 71894. Under the Federal Workplace Guidelines, a negative result on these initial immunoassay tests do not require confirmation testing by another method. *See id.*

69      Labtox is well aware that entities have published guidelines regarding the use of UDT in clinical pain management and knew that none of these guidelines recommended the routine use of quantitative laboratory testing, such as the LC-MS/MS testing that Labtox performs, to "confirm" expected negative immunoassay results.

70      Instead, when these guidelines addressed the need for confirmatory/quantitative laboratory testing, they generally recommended a UDT protocol whereby an immunoassay test is administered first and then only *unexpected* results are referred for laboratory-based confirmatory testing via a quantitative method such as LC-MS/MS.

71      For example, the Washington State Agency Medical Directors Group Interagency Guideline on Opioid Dosing for Chronic Non-Cancer Pain ("Washington State Guidelines") states that the purpose of the immunoassay test is to provide rapid results that should help avoid further, unnecessary laboratory confirmation testing of expected results: "The advantages of immunoassays are their ability to concurrently test for multiple drug classes, provide rapid results and guide appropriate utilization of confirmatory testing." Washington State Agency Medical

Directors' Group, *Interagency Guideline on Opioid Dosing for Chronic Non-cancer Pain*, 2010

update, available at http://www.agencymeddirectors.wa.gov/Files/OpioidGdline.pdf.

72      The Washington State Guidelines recommend such confirmation testing only for

positive results: "When the immunoassay result is unexpected and the patient does not

acknowledge or credibly explain the result, a confirmatory test using either GC/MS or LC/MS/MS

should be ordered." Similar recommendations are made by other authoritative entities, including

the ASIPP and SAMSHA. *See* Manchikanti L, Abdi S, *et al.*, *Pain Physician 2012*; 15:S67-S116,

ISSN 1533-3159, ASIPP Guidelines for Responsible Opioid Prescribing in Chronic Non-Cancer

Pain; Substance Abuse and Mental Health Services Administration, *Clinical Drug Testing in*

*Primary Care*, Technical Assistance Publication (TAP) 32, HHS Publication No. (SMA) 12-4668.

## V.      DEFENDANTS' FRAUDULENT SCHEMES

### A.      Labtox Bills for Testing that is Not Medically Necessary Because it is Not Ordered as Part of Individualized Treatment of the Beneficiary Whose Urine is Tested.

73      Although Labtox knew that no physician was present at these facilities, and no

physician had been or would be individually involved in assessing the actual needs of any

individual resident of the Facilities (including reviewing the results of the urine drug tests to further

tailor the need for further treatment and/or testing), Labtox developed a system by which

physicians would execute a standing order forms purporting to order testing (and the same testing)

for all of the residents of a particular facility.

74      Labtox did so to encourage routine, excessive UDT.

75      Specifically, Labtox knew UDT orders were not actually ordered by a physician or

other person authorized to order a test based on any individualized determination that the test was

medically necessary for the treatment of a particular individual; instead, Labtox knew that

physicians were signing "standing orders" for Facilities supposedly requesting that testing be performed of all of the residents at that facility.

76      However, with respect to many of these facilities, the physicians who signed these standing orders did not have a physician-patient relationship with any of the residents of the rehabilitation facilities, let alone a relationship with each resident.

77      Further, upon information and belief, the physicians who ordered tests to be performed for residents of the Facilities did not maintain a medical record for any of the residents of the Facilities.

78      Indeed, the physicians who ordered tests for the residents of the Facilities generally did not review the results of the tests.

79      Labtox had an information system which enabled the Facility to review the results of the tests.

80      However, the password to access the information system would only be given by Labtox to the Facility, and not to the physician who was supposedly ordering the test.

81      In order for an order for urine drug testing to be medically necessary, the ordering physician should review the results in order to customize the testing to be performed in the future to the patient's actual circumstances; for instance, a patient found to have used a certain drug may suggest that it is medically appropriate to test further for that drug while negative results (results indicating that the drug is absent) may suggest that it is medically appropriate to not perform further testing, or, to perform testing less frequently for drugs that the patient has been tested for and shown not to have consumed.

82      However, the physicians ordering the testing at many of the Facilities did not perform any such individualization because the physicians never reviewed the results of the tests.

83     Labtox knew that the physicans who were (purportedly by standing order) ordering tests at many of the Facilities were not engaging in actual physician-patient relationships with the persons being tested and were not reviewing the results of the tests or otherwise engaging in in any individualized decision making with respect to what tests should be ordered because of at least the following:

(A)     The standing orders referenced a particular facility, but not a particular patient.

(B)     Labtox never received communication directly from a physician relating to testing of a particular patient of one of the Facilities; instead, all communications would come from the Facilities, themselves.

(C)     When Labtox would explain its testing capabilities to rehabilitation facilities, some of the rehabilitation facilities would explain that they did not have an on-site physician and that their residents were not in regular contact with a physician who could order tests for all of the residents of the Facility. Labtox would respond to these comments by telling the Facility that, while Labtox could not pay the physician directly, the Facility could arrange for a physician to sign a standing order for all of the Facility's residents. Labtox would explain further that the physician could simply be someone that the Facility representative knows from church or otherwise has some acquaintance with. When Labtox's CEO would become aware that a facility was willing to consider using Labtox's services but did not have a physician on site, Labtox's CEO would follow up to make further

attempts to suggest to the facility that the facility arrange for a physician to sign a "standing order" for all of the Facility's residents.

(D)     Many of the Facilities regularly used the same physician for all locations, even if geographically disparate.

(E)     The physician was, in many circumstances, located a great geographical distance from the location of the Facility in question.

(F)     Labtox loudly proclaimed internally that it would never again take as a source of referrals a facility that generated UDT specimens in an appropriate manner.   Specifically, Labtox performed testing of the urine of persons associated with Fayette County Mental Health Court.   Fayette County Mental Health Court insisted on having each of its participants whose urine was to be tested have his or her individual physician provide Labtox with an order relating to the testing to be performed by Labtox relating to that participant.  Defendant Coburn expressed his frustration with the logistics of obtaining and maintaining individually-tailored authorizations relating to the Fayette County Mental Health participants, and exclaimed that "we're never doing that again, that's a bitch," or words substantially to that effect, referring to the logistics of obtaining and maintaining individually-tailored authorizations for sources of UDT referrals.  Coburn directed Relator and Defendant Erica Baker to seek facilities which would not request individualized orders, stating that "standing orders are much easier and it's a pain in my ass, or words substantially to that effect.

84     Labtox would train collectors, who were also employees of the inpatient facility, on how to operate Labtox's test ordering system.

85     Labtox would enter the physician's information into Labtox's test-ordering software and train the collector employed to collect test specimens at the Facility on how to order tests from Labtox, including explaining to the collector which physician on the test-ordering software was the physician supposedly ordering the collector to collect the specimen.

86     Labtox would then train the collector to, whenever the Facility determined to perform a test, select the physician who had signed a standing order for the Facility, to select what tests were to be performed, and to indicate "signature on file" in reference to the signature of the supposedly-ordering physician.

87     On Labtox's UDT-ordering form, which, upon information and belief, Labtox developed, there were only three options that a collector could select.  None of the options permitted the person selecting the testing to specify that only a particular drug needed to be tested. Instead, each of the options called for testing for, at a minimum, an entire panel of drugs.

88     Labtox specifically chose not to provide an option on its UDT-ordering form of allowing only certain drugs to be tested because Labtox knew that such an option would potentially limit the amount of UDT requested.

89     Further, the form for ordering a test did not contain any language indicating that routine screening tests would not be covered, in violation of the Compliance Program Guidance for Clinical Laboratories, 63 Fed Reg. 45076 at 45081.

90     The route taken by the "standing order" forms themselves further demonstrates that the actual purpose of the "standing order" forms was not to guide the actual treatment of the residents of the Facilities (even at the Facility-wide, not-individualized-to-any-particular-resident

level), but instead to attempt to "paper" the issue of medical necessity (although, as discussed above, it was not based on actual medical necessity and did not meet the documentation requirements for appropriate billing to the United States Government).

91     Specifically, the physicians preparing the "standing order" documents did not send those documents to the collectors or the Facilities (i.e., the persons supposedly responsible for carrying out the order).

92     Instead, the physicians would send their "standing order" document directly to Labtox, often by facsimile.

93     At some point, Labtox decided that it should have the original standing order in its files.

94     Therefore, Labtox tasked Relator with physically travelling about the Commonwealth to obtain signed standing order documents from physicians and to return those documents to Labtox's office, and this became a substantial part of Relator's work for Labtox.

95     The physicians who would sign the "standing order" documents would often be located far away from the Facilities that were the subject of the document.

96     The physicians would, if they signed the "standing order" document in Relator's presence, generally sign the document and hand it back to Relator; in general, the physicians would not obtain a copy of the signed document for the physician's records at the time of signing and Labtox neither had the capability of making a copy for the physician at the physician's location (generally, it was simply Relator at the physician's office) nor did Labtox provide a copy to the physician upon the form being returned to Labtox's facility.

97     Further, Labtox did not send a copy of the standing order to the Facility.

24

98     Thus, despite supposedly ordering certain testing for residents of a particular Facility, the standing order document passed directly from the physician to Labtox, and no person at the Facility would be guided by the standing order document regarding how UDT should in fact be performed for the residents of the Facility.

99     However, as discussed in more detail in Section V(B) below, it was the Facilities, not the physicians, who decided to use Labtox and then decided what testing to perform and how often to perform the testing.

100     It is only in light of this fact – the fact that the physician-less Facilities (with ample encouragement from Labtox) were deciding on their own initiative that testing should be performed (and, if so, what tests to perform and how frequently), and in making these decisions were not relying upon any physician decision (even a facility-wide, un-individualized decision such as that supposedly expressed in the standing order documents) – that the route taken by the standing order document itself makes sense:  the document was not sent to the Facilities because the Facilities were not acting based on the physician's orders and therefore did not need the order; instead, the physicians' standing orders were only a veneer maintained by Labtox to create the appearance that the excessive UDT it was billing to the United States Government was medically necessary.  It was not.

101     Further, in addition to being aware that the physicians who were signing the standing orders did not perform any individualized determination of the medical necessity for each Facility resident of the tests purportedly being ordered on the "standing order" basis, Labtox knew from other circumstances that the tests being ordered were not medically necessary.

102     For instance, some of the physicians would regularly sign "standing order" forms, which stated on their face that they were for a particular month, for several months at a time.

25

103     On some occasions, the physician would sign the form for months that had already passed, backdating the form to correspond to the month that was the subject of the form.

104     On other occasions, the physician signed for not only the current month, but also for several future months, despite not having reviewed the results of the current month's testing at the time of signing the orders for future months.

105     Labtox therefore knew that the physician was not performing an individualized determination of the medical necessity of the tests being ordered for future months, but nevertheless accepted "standing order" forms for multiple months in this fashion.

106     Indeed, on one occasion, a physician provided Ms. Secamiglio with six months of forms all at once, explaining that the physician was going to be on vacation.  Ms. Secamiglio returned to Labtox and provided the forms to Defendant Erica Baker, Ms. Baker stated that "it might not look right" if Ms. Baker put all of the forms in the binder she maintained of standing orders, and therefore she would put the current month's form in the binder and put the remainder of the forms in her desk and insert them into the binder when the month in question arrived.

107     On other occasions, physicians would sign the "standing order" form, but not complete the form.  In other words, the physicians would not "check the box" to indicate what testing the physician was ordering be performed for the residents of the Facility in question.

108     When this would occur, Relator would deliver the "standing order" form to Defendant Erica Baker, who would say that Labtox was not going to spend its time and the physician's time having the physician re-complete the form.

109     Ms. Baker on those occasions then herself checked the boxes for the type of UDT supposedly being ordered by the physician, in effect filling in and cashing the "blank check" form

the physician had provided, and then retained the "standing order" as the supposed order of the physician who signed it before it was completed by Ms. Baker.

110    Defendant Erica Baker is not a physician or other person authorized to order UDT.

111    Further, in addition to knowing that physicians were not making individualized decisions regarding what UDT should be performed, Labtox knew that the physicians who were supposedly ordering the UDT were not maintaining medical records relating to the residents at the Facilities whose urine was being tested.

112    Therefore, because records were not being maintained at all by the physicians relating to these persons, Labtox knew that the physicians were not documenting in such persons' records the basis for the physician's determination of the medical necessity of the testing.

113    Indeed, although being authorized and empowered to obtain from physicians documentation of the medical necessity of the UDT for each person for which UDT was ordered (*see* 42 C.F.R. § 410.32(d)(3)), because Labtox knew that such documentation did not exist, Labtox never requested such documentation from the physicians.

114    Further, on at least one occasion, a representative of a payor called Labtox to ask Labtox to submit documentation of the medical necessity of the testing; on this occasion, Defendant Erica Baker, Defendant's Chief of Operations and Compliance, took the call and, in a rude and dismissive tone, stated "we don't have those records.  We are just the lab.  You need to contact the physician," or words substantially to that effect, and then hung up on the caller.

115    In short, Labtox, having designed a scheme to generate massive amounts of testing without individualized determination of the medical necessity of such testing, and knowing that the testing was not medically necessary, improperly and falsely submitted claims to the United States Government for payment for that testing, and by doing so knowingly violated the FCA.

**B.** **Labtox Violates the Anti-Kickback Statute By Providing Kickbacks to the Facilities.**

116    Further, Labtox violated the FCA by billing the Government after providing kickbacks to the persons responsible for sending urine to Labtox for testing.

117    These kickbacks were intended to, and did, increase the amount of urine sent to Labtox for testing, which in turn increased the amount Labtox billed the United States Government.

118    As discussed above, Labtox utilized sham "standing orders" from physicians directing testing.

119    However, not only did this fail to meet the medical necessity requirement, Labtox's use of "standing orders" from physicians not actually involved in the treatment, or even the testing regime, applicable to the persons to whom it was applied, had another effect: the physicians were not the persons who selected Labtox as the laboratory to perform testing of urine for the residents of the Facilities: the Facilities were the initiating actors who decided to utilize Labtox, and who then, once Labtox was selected as the laboratory to be used, decided when to perform the testing (while Labtox urged them to test with ever-greater frequency).

120    In this situation of the Facilities essentially being the decision-maker with respect to whether (and how often) Labtox tested the Facilities' residents, Labtox told the Facilities (as part as one of its "selling points" in explaining Labtox's services to a Facility) that Labtox would employ a collector to collect specimens and send them to Labtox for testing and that, rather than Labtox itself selecting a collector, Labtox would utilize, train and pay a person selected by the Facility to serve as the collector if the Facility chose to use Labtox for drug testing.

121    The collector was selected not by the physician or by Labtox, but by the Facility.

28

122    Indeed, many of the collectors never met or had any contact with the physician who was supposedly ordering the tests for which the collector was collecting samples.

123    As a result of Labtox's offer to utilize as collector the person identified by the Facility that was going to send urine to Labtox, many Facilities selected Facility employees as the person to be paid by Labtox for serving as collector.

124    Selecting a Facility employee as the person the Facility directed Labtox to employ as a collector had the effect, from the Facility's standpoint, of relieving the Facility of the obligation to pay the employee pay from the Facility's funds during the time that the employee was serving as a Labtox "collector."

125    In other words, if an employee was going to be present at the Facility eight hours a day, but was going to be paid by Labtox for four of those hours, then the Facility would, as a practical matter, as a result of directing that the Facility employ the employee as collector, only have to pay the collector for four hours, even if the employee performed work for the Facility during the (often excessive) time attributed to the employee working for Labtox as a collector.

126    In addition, many of these "collector" employees regularly charged for substantially more time for their work as "collector" than the actual amount of time needed to collect the sample, order the test, and send the test to Labtox for testing.

127    However, because Labtox knew that facilities liked having their employees receive money from Labtox for "collector" compensation, Labtox, despite being aware that the employee was charging for more time than the employee actually took to perform "collector" duties, paid the excessive "collector" wages as a form of kick-back to the Facilities for sending drug sample to Labtox for testing.

128     Further, because the employees often were paid a higher hourly rate for working as a Labtox "collector" than they were paid by the Facility (many collectors were paid $15.00 per hour for time asserted by the collector to have been spent as collector), the employees had an implicit incentive to report to Labtox that they had performed more hours of work as a collector, which would logically suggest a need to test more persons to justify the additional hours charged.

129     Being aware of this, Labtox installed a computer-based timeclock system for collector's to use to track the time they were billing to labtox for work as a collector.

130     Of course, Labtox knew that the collector collecting more urine samples translated directly into Labtox performing more testing, which translated directly into the United States government being billed more for services.

131     Indeed, because of Labtox's use of the sham "standing order" system, it was the Facilities, and often the person paid as "collector," and not any physician, who determined when drug testing should be performed at the Facilities.

132     Therefore, in addition to not being performed because they were not medically necessary, tests were performed and urine was collected to be sent to Labtox to maximize the amount of money paid in collector compensation to Facility employees and other persons related to the Facility.

133     Indeed, in addition to receiving kickbacks by using the "collector" compensation to displace the Facilities obligations to pay its own employees, certain of the Facilities had Labtox pay "collector" compensation to relatives of Facility representatives.

134     For instance, the "collector" paid by Labtox to collect samples for Edgewater Recovery in Moorehead, Kentucky (one of the Facilities) was Myra Elam, the wife of Edgewater Recovery's Director, John David Elam (and also an employee of Edgewater Recovery).

135     Similarly, a manager at Rebos Recovery Center, another of the Facilities, requested that Labtox employ her granddaughter as a collector at its Bulan Facility, which Labtox then did, paying the granddaughter compensation for time asserted to be served as collector.

136     As yet another example, the Director of Blue Waters Testing and Assessment, LLC in Lexington, Kentucky,[2] Dave Waters, requested that Labtox employ his son as one of the collectors paid by Labtox for collecting samples; Labtox obliged and paid the son compensation for time asserted to be served as collector.

137     Moreover, some of the persons responsible for formulating Facility policy, including the sending of resident urine to Labtox for testing, did not avail themselves of the modesty-in-corruption of diverting the kickback to a relative; for instance (and, upon information and belief, this is not the only example of a Facility representative directing Labtox to pay, and Labtox paying, collector compensation directly to the Facility representative making the decision about whether to use Labtox for testing), the Director of the Friends of Sinners rehabilitation facility, a Facility in Owensboro, Kentucky, requested that Labtox employ the Director himself as a collector.

138     Labtox complied and paid the Director of the Friends of Sinners facility for time asserted to be served as collector.

139     In addition to displacing the Facilities' obligations to its employees and providing Facility representatives an opportunity to steer money toward their relatives or even themselves, Labtox knew that providing the Facilities with an opportunity to select the collectors would also

---

[2]     Unlike most of the entities that generated urine sample referrals to Labtox, which were inpatient/residential drug treatment facilities ("Facilities"), Blue Waters was not a residential drug treatment facility but instead primarily performed drug testing ordered by courts. As such, Labtox knew that the testing was being requested not because it was medically necessary, but because it was ordered by the Courts, but billed the United States Government anyway for this testing of samples collected through Blue Waters. See Section V(D) below.

provide the Facilities with the ability to boast that the graduates of the Facilities were being successful.

140    Specifically, many Facilities requested that Labtox hire as a collector one or more recent graduates of their residential drug rehabilitation programs; Labtox, if it was itself selecting the persons who would serve as collector, would not have employed as many recent graduates of the Facilities.

141    Labtox permitting the Facility to request that Labtox hire the Facility's graduate enabled the Facility to point to the graduate's employment in describing the program's success in its advertisements and discussions with potential future residents, which was a benefit to the Facility.[3]

142    Labtox was aware of the requirements of the AKS, and in fact discouraged Facilities from using cheaper point-of-care ("POC") drug test cups by pointing out to the Facilities that Labtox was prohibited by law (referring to the AKS) from providing Facilities with free POC cups.

143    However, despite being aware of the AKS, Labtox paid kickbacks to Facilities (who were the actual persons generating tests) through the use of collector compensation.

144    In addition to the collector compensation kickbacks, Labtox provided other kickbacks to the Facilities who generated business for Labtox.

145    For example, Defendant Erica Baker, Labtox's Operations Director, had Labtox provide free nicotine testing for the Hope House Facility in Bowling Green, Kentucky (nicotine

---

[3]    Sadly, as is unfortunately common amongst recent graduates of drug rehabilitation programs, certain of the collectors relapsed and failed drug tests of their own.

testing could generally not be billed by Labtox to Medicare or Medicaid, but the Facility viewed it as valuable because it desired to monitor whether or not residents were consuming nicotine).

146     Upon information and belief, Labtox paid other kickbacks to Facilities to encourage them to use Labtox's testing services and to generate more business for Labtox, including but not limited to the copay waivers discussed in Section V(C) below.

147     At the time it paid the kickbacks, Labtox knew that the kickbacks were illegal and violation the AKS.

148     Labtox, in billing the United States Government, expressly and/or impliedly represented that it had not violated the AKS in connection with the services being billed.

149     This representation was false, and Labtox knew this representation was false at the time it was made.

150     Further, this representation was material.

151     Indeed, had Labtox disclosed its violations of the AKS to the Government at the time it billed the Government, the Government would not have paid Labtox for the services generated through prohibited kickback arrangements.

152     Because of its violations of the AKS and its false, material express and/or implicit representations to the United Stated Government that it had not violated the AKS in connection with its claims, the submission of claims to the United States Government were knowingly false and violated the FCA.

**C.     Labtox Billed For Testing It Knew Was Not Medically Necessary But Was Instead Being Performed Because It Was Ordered by a Court as Part of Court Proceedings.**

153     Further, with respect to certain of its testing, Labtox violated the FCA by expressly or implicitly representing that the UDT was medically necessary when Labtox knew that the

testing was instead court-ordered and that Medicare and Medicaid regulations make clear that tests which are ordered by courts or other third parties are not medically necessary.

154    For instance, Fayette County Family Court in Fayette County, Kentucky utilized court-ordered drug testing so frequently that it developed its own form[4], a redacted copy of which is attached hereto as Exhibit 1.

155    This form directed that the testing be performed by Blue Waters Assessment & Testing Services, LLC ("Blue Waters") and that the person whose urine was being tested provide such person's medical insurance information to the testing facility, stating that:

> Each and every time the individual being tested goes to BATS to be tested, that individual MUST bring his or her photo identification and $20 Collection Cup Fee (cash or card only), unless payment is specifically Ordered to be paid by the Cabinet or DYS in paragraph 2 below. Individual is also asked to bring their insurance card to cover the lab cost. If insurance doesn't cover this cost, the individual will NOT be billed. This provides for a 60-panel drug & alcohol screen using LCMS analysis, with qualitative/quantitative report in the next 2-3 business days.

156    Blue Waters, after collecting the urine sample of the person ordered to provide the testing, had the testing performed by Labtox.

157    Labtox knew that the urine being sent to Labtox by Blue Waters for UDT was being obtained because UDT was Court-ordered for the persons providing the urine, but nevertheless billed Medicare and Medicaid for these tests.

158    Labtox's claims for payment from the United States Government for UDT which it knew was court-ordered violated FCA.

---

[4]    Labtox's assurances to the persons and Facilities ordering testing that it would violate the copay requirements of Medicare and Medicaid are reflected even in the Court's form, which states that the person whose urine is tested will not have to pay anything "if insurance doesn't cover th[e] cost." See Exhibit 1.

**D.      Labtox Billed Despite Knowing It Was in Violation of Medicare and Medicaid Copay Requirements.**

159     Further, Labtox submitted false claims by billing for lab testing while knowing that Labtox had intentionally violated the applicable rules relating to the collecting of copays from Medicare and Medicaid beneficiaries.

160     Specifically, Medicare and Medicaid each require that a provider billing Medicare or Medicaid certify as part of its billing that it has followed the Medicare and Medicaid rules relating to the collection from the Medicare or Medicaid beneficiary a copay.

161     The representation, whether express or implied, made in submitting a claim that copays have been collected as required is material.

162     Indeed, the purpose of a copay is to require the beneficiary to pay some small amount for the utilization of the service in order to prevent overutilization of services.

163     While a copay is generally only a small percentage of a total amount paid to the provider for the service in question, patients will often avoid incurring charges (which would cost the government substantially more than the copay) if a copay is charged; in this manner, the government avoids altogether incurring a large amount of liability for excess treatment of limited or totally nonexistent utility.

164     If, on the other hand, incurring treatment has zero cost to the beneficiary, beneficiaries will have no incentive to limit utilization and will generally order much more and much more expensive treatment.

165     For instance, the copay for laboratory testing under Kentucky Medicaid is $3.00.

166     While a Medicaid beneficiary who has a serious medical condition may pay $3.00 to have laboratory testing to assist in the treatment of that serious medical condition, a Medicaid

beneficiary would be much more likely to object to unlimited or excessive laboratory testing if the laboratory testing provider charged $3.00 per test for the testing.

167     In order to avoid the intended beneficiary-self-limiting intended consequence of the Medicare and Medicaid copay requirements, Labtox regularly advertised and communicated to the Facilities that, if the Facilities sent their residents' urine to Labtox for testing, Labtox would, whether Medicare, Medicaid or any other applicable insurance paid Labtox or not, not charge anything for the testing to the Facility's residents whose urine was being tested.

168     Labtox systematically trained its employees, including Relator, to emphasize this point in "selling" Labtox's testing services to Facilities.

169     Indeed, Labtox's assurances to the persons referring tests to Labtox that Labtox would not charge co-pays ultimately were documented in a form of Order adopted by the Fayette County Circuit Court, Family Division, which stated that "Each and every time the individual being tested goes to BATS to be tested, that individual MUST bring his or her photo identification and $20 Collection Cup Fee (cash or card only), unless payment is specifically Ordered to be paid by the Cabinet or DYS in paragraph 2 below. Individual is also asked to bring their insurance card to cover the lab cost. If insurance doesn't cover this cost, the individual will NOT be billed. This provides for a 60-panel drug & alcohol screen using LCMS analysis, with qualitative/quantitative report in the next 2-3 business days." See Exhibit 1.

170     Thus, while Blue Waters collected $20.00 from persons being tested, no matter what insurance (or even if no insurance) applied to the person in question, this was for a "Collection Cup Fee," and Blue Waters did not collect $3.00 for Labtox per Medicaid test to be perform, and Labtox did not itself ensure that this amount was collected.

171     Indeed, Labtox followed up on its promise and advertisement with respect to all of the Facilities: it did not collect, and did not have anyone else collect, the required copays from any of the beneficiaries whose urine was being tested.

172     Labtox's waiver of copays, and failure to collect copays, constituted the payment by Labtox of prohibited remuneration to program participants to utilize Labtox testing services, with the result that the beneficiaries permitted far more Labtox tests to be performed than would have been performed had copays been collected and the copay requirements followed.

173     Labtox knew (or, at the very least, should have known) that its waiver of and failure to collect copayments was likely to influence the beneficiary to order or receive items or services payable by federal or state healthcare programs, such as Medicare or Kentucky Medicaid, from Labtox.

174     Labtox's waiver of copays also constituted a kickback to the Facilities themselves.

175     Specifically, by assuring the Facilities that Labtox would test the urine of the residents of the Facilities for "free" (from the standpoint of the Facilities and its residents, but not that of the United States Government), Labtox enabled the Facilities to be able to represent to potential residents, as well as courts and relatives who might place residents with the Facilities, that the Facilities would be able to perform "free" laboratory testing of resident's urine for drugs.

176     This was a promise no other facility could make because, in order to make such a promise, other facilities would have to pay for the testing themselves or, if utilizing Medicare or Medicaid was otherwise appropriate, follow the copay rules, which required the payment of a copay.

177     Accordingly, Labtox's waiver of resident copays was, in addition to being payment of remuneration to the resident/beneficiary in violation of the CMPL, a kickback to the Facility in violation of the AKS, and a false claim in violation of the FCA.

**VI.     The United States Was Harmed By Labtox's Conduct.**

178     As a result of Defendant's conduct, the Medicare program paid Labtox many millions of dollars for many thousands of false and/or fraudulent claims for non-covered drug tests.

**FIRST CAUSE OF ACTION**
**(False Claims Act: Presentation of False Claims)**
**(31 U.S.C. § 3729(a)(1) and (a)(1)(A))**

179     Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

180     Defendant knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States and Kentucky Medicaid, including those claims for reimbursement of laboratory drug tests that violated the Stark Law and the Anti-Kickback Statute and that were ordered by physicians for uses that were not reasonable and necessary for the diagnosis or treatment of individual patients.

181     Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

**SECOND CAUSE OF ACTION**
**(False Claims Act: False Statements Material to False Claims)**
**(31 .S.C. § 3729(a)(1)(B))**

182     Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

183     Defendant knowingly made, used, and caused to be made or used, false records or statements — i.e., false statements regarding compliance and coverage for its services and false

38

statements on forms CMS-855B, 837P and CMS-1500—to get false or fraudulent claims paid and approved by the United States.

184     Defendant's false certifications and representations were made for the purpose of inducing physicians to order its services and getting false or fraudulent claims paid, and payment of the false or fraudulent claims was a reasonable and foreseeable consequence of the Defendant's statements and actions.

185     The false certifications and representations made and caused to be made by Defendant were material to the United States' and Kentucky Medicaid's payment of the false claims.

186     Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

### THIRD CAUSE OF ACTION
### (Conspiracy by Individual Defendants to Cause False Claims Act Violations By Defendant Labtox, LLC)

187     Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

188     The individual Defendants, and each of them, took overt acts to conspire with Defendant Labtox, LLC and each other to cause Labtox, LLC to submit false claims to the United States Government, and accordingly each Defendant should be held jointly and severally liable to the same extent as the liability of Defendant Labtox, LLC.

### PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays

A.     That a jury be empaneled and that all issues triable by jury be tried by the jury;

B.    That judgment be entered in its favor against Defendants for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law,

C.    That Relator Caitlin be awarded an award from the recovery of the United States, as authorized under the False Claims Act, recover her attorney's fees, and be granted such further relief as may be just and proper, and

D.    That all such further relief as may be just and proper be awarded.

Respectfully submitted,

John R. Kleinschmidt, III
THE LAW OFFICES OF JOHN R.
KLEINSCHMIDT III, PLLC
P.O. Box 1746
Lexington, KY 40588
(859) 866-3097
john@employmentlawky.com

Mark N. Foster
Law Office of Mark N. Foster, PLLC
P.O. Box 869
Madisonville, KY 42431
(270) 213-1303
Mfoster@MarkNFoster.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing document was served on:

United States Attorney's Office
Eastern District of Kentucky
260 W. Vine Street, Suite 300
Lexington, KY 40507

John R. Kleinschmidt, III

40